

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-288-CV

IN THE INTEREST OF L.D.K., M.L.P., S.D.P., AND D.E.P.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

This appeal follows an order terminating the parental rights of Appellants Michael P. and Stacy K. Michael argues that the trial court erred by denying his motion for extension, that the evidence is legally and factually insufficient to support the trial court's finding that he engaged in culpable conduct under section 161.001(1) of the Texas Family Code, and that the evidence is factually

------------

[1] *See* TEX. R. APP. P. 47.4.

insufficient to support the trial court's finding that the termination of his parental rights is in the best interest of L.D.K., M.L.P., S.D.P., and D.E.P. (collectively, "children").  Stacy argues that the evidence is legally and factually insufficient to support the trial court's finding that the termination of her parental rights is in the children's best interest.  We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Stacy and Michael are the parents of the children at issue in this case and have lived together since 1995.  At the time of trial, L.D.K. was ten years' old, M.L.P. was nine years' old, S.D.P. was six years' old, and D.E.P. was one year old.

In 2001, when the family lived near Harris County, CPS removed the children, except for D.E.P.,[2] when S.D.P. tested positive for cocaine after birth. Stacy admitted to using cocaine a "couple of weeks each month" during her pregnancy with S.D.P. Stacy and Michael both completed substance abuse programs for drugs and alcohol, respectively, and in July 2002, CPS returned the children to live with Stacy and Michael.  Stacy relapsed two years later, and Michael began drinking again within three years of his rehabilitation.  Then, sometime in 2005 after Stacy relapsed, Michael also began using cocaine.

---

[2] D.E.P. had not been born at this time.

2

In September 2005, when Hurricane Rita hit Harris County, the family lost its trailer home and eventually moved to Tarrant County. Neither Stacy nor Michael has held a stable job since moving to Tarrant County. Stacy stated that she had not worked anywhere since moving to Tarrant County. Michael worked a few odd jobs in the time between when the family moved and when the children were removed, but his main income has been a Supplemental Security Income (SSI) disability check that he receives for injuries he suffered while performing a plumbing job. Stacy admitted that the couple used a portion of this monthly SSI check to pay for drugs.

While in Tarrant County, the family has lived in four hotels, which FEMA temporarily paid for, and at times, the family lived in shelters. Stacy stated that the family would stay in shelters for free for seven days and then leave once the shelter required payment. Stacy also testified that she had to use L.D.K.'s, M.L.P.'s, and S.D.P.'s SSI checks that they received for various medical issues to pay for the hotel rooms. Because she was spending the money on hotel rooms, Stacy was unable at times to buy the appropriate medicine for the children.

On October 10, 2006, Stacy and D.E.P. checked into the Arlington Life Shelter to allow Michael time and space to move the family into an apartment. Stacy left the other three children with Michael because she was unable to

3

control all the children at the shelter. The shelter required Stacy to submit to a criminal background check and a drug screening. Stacy tested positive for cocaine and admitted that she and Michael had smoked crack cocaine together and that they had most recently used two days prior to coming to the shelter. CPS investigators came and removed D.E.P. from the shelter, and additional investigators went to the family's hotel room and removed the other three children.

Even though the children were removed in October 2006, the parents failed to make visits until January 2007. Stacy claimed that she and Michael could not make the visits in Fort Worth because they lived in a hotel in Arlington and they had no transportation. Michael stated that he and Stacy could not move to a hotel in Fort Worth because it would cost too much money and because they did not have transportation to get there.

CPS created a service plan for Stacy and Michael after the removal, but Shawna Wells, a CPS caseworker, was unable to deliver it to the parents at that time because she could not locate them. Wells personally delivered the service plan to the parents in January 2007. Neither parent had completed their services as of the time of the trial in August 2007. Both parents continued to use drugs after the removal of the children, but they testified that they had last used cocaine in April 2007. The family's living situation had not

4

improved since the removal. Stacy stated that she had recently stayed at a free shelter in Parker County, but the shelter asked her to leave for failure to complete her chores on time. Stacy and Michael then began living out of their car. And in fact, the couple stayed in their car the night before trial, but on the first day of trial, the car was repossessed from the courthouse parking lot.

After hearing evidence on August 14 and 16, 2007, the trial court granted the petition of the Department of Family and Protective Services (DFPS) to terminate Stacy's and Michael's parental rights. The trial court found by clear and convincing evidence that Stacy and Michael knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, and that Stacy and Michael engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (Vernon Supp. 2007). The trial court also found by clear and convincing evidence that the termination of Stacy's and Michael's parental rights was in the children's best interest. *See id.* § 161.001(2).

### III. MOTION FOR EXTENSION

Before DFPS called its first witness, Michael's attorney made an oral motion for an extension of time so that both parents could comply with the

service plan. The attorney argued in support of the motion that the parents had obtained transportation so that they could start completing their services, that they had been clean from drug use since April 2007, and that they were ready to move into an apartment. He also mentioned that the children wanted to go home with their parents. Michael's main argument before the trial court was that the service plan given to the parents was deficient. He stated that while the top of service plan properly addressed the parents as "Stacy [K.]" and "Michael [P.]," the body of the service plan referred to Michael P. as "Mr. [K.]." Thus, he argued that the service plan was not specific enough to apprise Michael of the services that he was required to complete. *See* TEX. FAM. CODE ANN. § 263.102 (Vernon 2002). The trial court denied the motion, and Michael now argues in his first issue that the trial court erred by denying the request. *See id*. § 263.401(b) (Vernon Supp. 2007).

We review a trial court's determination on a motion for extension for an abuse of discretion. *In re D.W.,* 249 S.W.3d 625, 647 (Tex. App.—Fort Worth 2008, pet. denied) (en banc). Section 263.401 of the Texas Family Code provides that, unless the court has commenced the trial on the merits or granted an extension, it must dismiss DFPS's suit for termination on the first Monday after the first anniversary of the date the court appointed DFPS as temporary managing conservator in a suit affecting the parent-child relationship.

6

TEX. FAM. CODE ANN. § 263.401(a). The statute also provides that the trial court may extend this deadline for up to 180 days if the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the DFPS and that continuing the appointment of DFPS as temporary managing conservator is in the best interest of the child. *Id.* § 263.401(b).

The attorney ad litem for the children did not oppose the motion. She stated, however, that her stance had nothing to do with whether the parents knew what services they were to complete—in fact, she stated that in her conversations with the parents they were both "very aware" of what services they each needed to complete—but was instead based on her role as a child-directed attorney and the fact that the three older children would agree to an extension because they would rather be with their parents. She went on further to say that "I don't have any argument that [Michael] had no idea what he was supposed to do. [Michael] was clear what services he was supposed to do. He and I have discussed those services." DFPS argued that a CPS caseworker had personally delivered to the parents letters regarding the services and that the parents had had plenty of opportunities to work on the services prior to trial.

Despite the manner in which the service plan was drafted, the statements by DFPS's attorney regarding the letters and by the attorney ad litem regarding Michael's knowledge of the services suggest that Michael did in fact have knowledge of the services that he needed to complete. There was no testimony in support of this motion from either parent regarding their knowledge of the services or what services they had completed. Based on the arguments and statements presented to the trial court, it was entirely within the trial court's discretion to determine that Michael had failed to present any extraordinary circumstances that would necessitate an extension. *See Shaw v. Texas Dep't of Family & Protective Servs.*, No. 03-05-00682-CV, 2006 WL 2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.) (not designated for publication) (holding that the appellant had not shown that needing more time after failing to make progress on the service plan for eight months amounted to "extraordinary circumstances" that necessitated the granting of the continuance). Thus, we hold that the trial court did not abuse its discretion, and we accordingly overrule Michael's first issue.

## IV. SUFFICIENCY ARGUMENTS

In his second issue, Michael argues that the evidence is legally and factually insufficient to support the trial court's findings that he endangered the children's welfare according to sections 161.001(1)(D) and (E) of the Texas

8

Family Code. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E). He also challenges the factual sufficiency of the evidence regarding the trial court's best interest finding. *See id.* § 161.001(2). In her two issues, Stacy argues that the evidence is legally and factually insufficient to support the trial court's best interest finding. *See id*.

**A.     Standards of Review**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and

9

strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth

of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

11

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Endangerment Findings

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E). Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being

12

was the direct result of the parent's conduct, including acts, omissions, and failures to act. *Id.* Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id*. However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id*.

To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *Id*. at 739. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. *Id*. Further, while mere imprisonment, alone, will not constitute a course of conduct that endangers the emotional or physical well-being of a child, it is a factor to be considered in the determination. *See Boyd*, 727 S.W.2d at 533–34.

The evidence demonstrates that Michael has had issues with substance abuse both before and after CPS removed the children. Michael began using cocaine at some point in 2005 after Stacy's relapse in 2004. The couple in

13

fact used a portion of Michael's disability check to pay for the cocaine.  Michael

testified that "before this happened," referencing the removal of the children,

he had used drugs only four or five times.  Bethany Hooser, a CPS investigator,

testified without objection, however, that Michael admitted to her co-worker on

the night of the removal that he "used daily."  Michael also stated that he had

not used drugs for two weeks prior to the removal, but again, this is contrary

to Hooser's testimony that Stacy had told her on the night of removal that the

couple had smoked crack only two days before the removal.

CPS did not ask Michael to take a drug test on the night of the removal,

but later, in January 2007, Shawna Wells, a CPS caseworker, asked Michael

to take a drug test, which he refused.  He refused for fear that he would miss

an appointment at the shelter and potentially risk not having a place to live.

Michael told Wells that he quit using drugs in April 2007, six months after CPS

removed the children.  Wells again asked Michael to submit to a drug test.  He

complied and took a hair follicle test on May 17, 2007.  Wells reported to

Michael, according to his testimony, that the test revealed that he had been

using "day and night."  And in fact, Wells testified that because of the "high

volume" in his drug test, she encouraged him to go into inpatient treatment.

Wells even offered to drive Michael to inpatient treatment, but he refused and

told Wells that he did not need inpatient treatment and that his meetings with Narcotics Anonymous (NA) were sufficient.

Michael testified that he attempted to enter CATS, an outpatient drug treatment program, but that the program would not admit him because the results from a second drug test showed that he had been "clean too long." Wells contacted the CATS program and found out that he had not met with a representative at the program for treatment.

Although Michael maintained that he quit using cocaine in April 2007, the evidence shows that Michael has had trouble in the past remaining sober even after he completed treatment in Harris County for his alcohol abuse. Given his history with substance abuse and in particular the fact that he used drugs for six months while the case was pending, the trial court could have inferred that Michael's substance abuse issues would likely recur and further jeopardize the children's well-being. *See R.W.*, 129 S.W.3d at 741.

There is additional evidence demonstrating a history of arrests. Michael served time after he was arrested for breaking into a house in Michigan. Michael rebutted this by saying that this incident occurred in the 1970s when he was "a kid." While living in Arkansas, Michael served three months in county jail for domestic violence, but Michael contends that the State released him early because a blood test revealed that someone had spiked his drink with

15

Visine, causing him to go "crazy" and "completely nuts." In Harris County, Michael served three days for driving on a suspended license. And most recently, after CPS removed the children, Michael was arrested for stealing three cases of beer and spent two weeks in jail for theft. Michael stated that he had intended to sell the beer so that he could pay for a motel room. The State then released Michael on bond, but he was rearrested shortly after his release for failing to appear at a hearing because he lacked transportation.

While some of these incidents are isolated and in the distant past, the most recent incident involving theft and the subsequent arrest for failing to appear occurred while the current suit was pending. The trial court was entitled to take that into consideration along with Michael's drug use in determining whether Michael had engaged in a course of conduct that endangered the emotional or physical well-being of the children. *See Boyd*, 727 S.W.2d at 533–34.

Viewing the evidence in the light most favorable to the judgment, we conclude that the evidence is such that a fact-finder could reasonably form a firm belief or conviction that Michael engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *J.P.B.*, 180 S.W.3d at 573. Thus, the evidence is legally

16

sufficient to support the trial court's findings under section 161.001(1)(E). Further, when considering the entire record, we hold that a fact-finder could reasonably form a firm conviction or belief that Michael violated section 161.001(1)(E). And while there is conflicting evidence regarding the extent of Michael's drug use, the trial court, as the fact-finder, enjoys the right to resolve conflicts within the evidence. *See In re T.N.*, 180 S.W.3d 376, 382 (Tex. App.—Amarillo 2005, no pet.). The trial court could have freely chosen to believe all, part, or none of the testimony espoused by any particular witness. *Id*.; *see also R.W.*,129 S.W.3d at 742 (stating that the fact-finder's function "is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony"). The disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is not so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding. *See H.R.M.*, 209 S.W.3d at 108. Accordingly, the evidence is also factually sufficient to support the trial court's finding that Michael violated section 161.001(1)(E).

Because we have held that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), we need not address whether the evidence is sufficient to support the finding under section

17

161.001(1)(D). *See R.W.*, 129 S.W.3d at 744 (stating that only one finding under section 161.001(1) is necessary to support a judgment of termination).

## C.    Best Interest Findings

In his third point, Michael argues that the evidence is factually insufficient to support the trial court's best interest finding.  Likewise, Stacy argues in two points that the evidence is legally and factually insufficient to support the trial court's best interest finding.  Because the evidence is largely the same for the analysis of both Michael's and Stacy's points, we will consolidate our review.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002).  There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the following:

(1)    the desires of the child;

(2)    the emotional and physical needs of the child now and in the future;

(3)    the emotional and physical danger to the child now and in the future;

(4)    the parental abilities of the individuals seeking custody;

18

(5)     the programs available to assist these individuals to promote the best interest of the child;

(6)     the plans for the child by these individuals or by the agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Evidence of a parent's unstable lifestyle can also support a fact-finder's conclusion that termination is in the child's best interest. *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child. *Id*.

Stacy testified that the children want to come home and that they are happy at home. Wells also stated that the children love their parents. But even taking this factor into consideration, there is ample evidence to support the trial court's finding that the termination of parental rights is in the children's best interest.

The most salient evidence presented at the hearing concerned the parents' drug abuse before and after the children were removed. Michael's drug history is detailed above, and Stacy has had an even longer, more troubling history with cocaine abuse, dating back to her time in Harris County when her children were first removed by CPS because S.D.P. had tested positive for cocaine. After CPS initially removed the children, Stacy entered a rehabilitation program but later relapsed in 2004. At trial, Stacy maintained that she had never used drugs in front of her children but that she instead used drugs in the bathroom of the hotel room while the children were asleep. Stacy admitted to using crack often.

Stacy attended CATS meetings but was eventually discharged based on her nonattendance. She testified that she did not want to quit but that she had no transportation to get to the meetings. Stacy had also gone to Step One and NA meetings to help her with her rehabilitation. However, like Michael, Stacy refused to go to inpatient drug treatment at CPS's request, even though Wells

20

offered to drive her to the facility. Both parents admittedly used drugs after CPS removed the children, but they both claim to have quit using as of April 2007. As we stated above, the trial court was entitled to infer that the parents' drug abuse might continue in the future and endanger the children's well-being. *See R.W.*, 129. S.W.3d at 741.

Stacy argues that while the evidence demonstrates that she had problems with drug abuse, "the best interest finding lacks a firm factual basis apart from the 'offending behavior,' [which Stacy] has affirmatively corrected." We disagree given the following evidence presented at trial.

Stacy and Michael are not currently employed. Michael worked a few odd jobs but stated that he had not worked since December 2004 or January 2005. Michael asserted at trial that he could not find employment in his profession as a welder because of the injuries he suffered after performing a plumbing job. He also stated that he had tried unsuccessfully to find work for two weeks as a day laborer in Arlington, Texas. Stacy, on the other hand, has not been employed since coming to Tarrant County. She testified that she had applied at Kroger and Wal-Mart but that no one had hired her. For income, she relies on $1,800 that L.D.K., M.L.P., and S.D.P. receive for their medical issues. Stacy is waiting on MHMR to turn in her paperwork so that she can also receive a disability check for her depression and bipolar disorder.

21

The evidence regarding the family's instability is particularly troubling given the emotional and physical needs of the children. L.D.K. has been diagnosed with bipolar disorder, learning disorder, mathematics disorder, and sibling-relations disorder. Wells reported that while L.D.K. still has issues, he is doing much better since he has been in CPS's care. M.L.P. has been diagnosed with bipolar disorder, attention deficit hyperactivity disorder (ADHD), and phonological disorder. S.D.P. has been diagnosed with ADHD, nocturnal and diurnal enuresis, provisional phonological disorder, developmental coordination disorder, and mild mental retardation.

Stacy stated that she had taken L.D.K. and M.L.P. to MHMR for help with their bipolar disorders and that MHMR eventually came out to visit Stacy and Michael at their hotel room to work on parenting skills for children with special needs. Wells testified that while the children love their parents, they are very high maintenance, and the parents do not have the ability to care for the children. L.D.K., M.L.P., and S.D.P. are all at least a grade level behind, and Wells went as far as to say that they were "extremely behind." Wells also testified that the children were behind socially but that they have made "extreme progress" in areas dealing with behavior and appropriate social boundaries. Wells testified that D.E.P. was not behind developmentally when CPS took custody of him but that he is not talking as much as he should.

22

Stacy attempted to home school the children in the 2005–2006 year, but she eventually realized that "[she] didn't know what [she] was doing." The next year, the children started school late because the school would not accept them without their proper medications. Stacy claimed that initially she could not afford the medications because she had to use the monthly checks that the children received for their medications to pay for a hotel room. Stacy claimed that the children were taking their medications daily when they were removed.

Lallay T., the foster parent of S.D.P. and M.L.P., testified that when S.D.P. first came to her house at age five, she still wore diapers, her fine motor skills were extremely slow, and she could not put on any item of clothing. She stated that as of the time of trial, S.D.P. could still not open a door or eat with a fork. Lallay observed M.L.P. and S.D.P. go up to complete strangers and beg for food. She also observed both children inappropriately use toys in a sexual manner.

The children's coordinator at the Arlington Life Shelter recalled that D.E.P. was "pretty dirty" on the night of the removal. Hooser remembered the other children being "somewhat dirty [and] unkempt" when CPS removed them from the hotel room, which Michael disputes, stating that the children had brand new clothes on when CPS removed them. Further, Lallay said that when S.D.P. and M.L.P. first arrived at her house, they were "totally infested" with lice.

23

There is also evidence demonstrating that the parents failed to complete their service plan, which included, among other things, parenting classes, drug assessments, bipolar and ADHD education classes, and counseling sessions. Stacy said that she had completed a psychological evaluation through MHMR but not through the doctor CPS requested. Stacy said that she had tried to contact the doctor that CPS provided but that no one called her back. In fact, Stacy said that she had called the doctor every day from January until the trial in August. Stacy testified that she had not completed her education classes and that she had not gone to TCADA for her drug abuse. Wells testified that the parents had not completed the requested psychological evaluations or parenting classes.

Michael argues that because the service plan referred to Michael P. as "Mr. [K.]" in the body of the document that Michael did not know what services he was required to complete. Michael maintained at trial that he had never received a copy of the service plan or "any paperwork" that Wells claimed she had personally delivered to the parents. He later stated, however, that he "never denied knowing that [he] needed services" but that Wells had explained to him that all he had to do was participate in drug rehabilitation, attend parenting classes, and take a psychological evaluation. Michael said that he "tried to" complete drug rehabilitation, completed his psychological

24

evaluation through MHMR, and attended one parenting class before losing transportation.

Contrary to Michael's testimony that he was unaware of what services he had to complete, Wells stated that in January 2007, she personally delivered the service plan to the parents along with a letter that was more specific with addressees and phone numbers of the facilities where the parents could complete the services. Wells also testified that before she visited the parents, she had called them on the telephone to go over the service plan. Wells said that she was "very, very specific" about what was expected of the parents and where they had to go to complete their services. Wells stated that the parents understood that they were receiving a service plan, that they told her that they would work services, and that they wanted to do everything they could to regain custody of their children.

Regarding placement after termination, DFPS plans to find adoptive homes for all the children. None of the current foster parents were dual-licensed as of the time of trial, although Lallay showed an interest in obtaining a dual-license. Wells testified that if Stacy's and Michael's parental rights were terminated that DFPS could "absolutely" find an appropriate adoptive home for the children. When the children were initially removed, some of the children

25

were placed in separate homes,[3] but Wells stated that it is DFPS's policy to first try to find a home for all four children after termination. Nicole Batson, a licensed professional counselor, provided therapy for M.L.P. and S.D.P. and stated that the girls need consistency and structure, that they have probably not had much stability given their struggles with small tasks, and that they both have an ability to move on and bond with a new family. Wells echoed these thoughts and stated that the children were adoptable and able to move on to a new life.

Conversely, Michael and Stacy have shown little ability to provide a stable environment for the children if they were returned. Before the removal, the family lived in multiple hotels and shelters. Stacy stated that she had recently stayed at a free shelter in Parker County but was asked to leave for noncompliance with shelter rules. Michael at one point stole beer from a convenience store so that he could sell it and pay for a hotel room. Eventually the couple lived out of their car, which was repossessed on the first day of trial. There was testimony that the family was looking to find an "all bills paid" apartment, but the family had not yet found such a place. The parents claimed

---

[3] L.D.K. was initially placed in a separate foster home because he sexually "perpetrated" S.D.P. when the children were temporarily living in a shelter. CPS separated D.E.P. from the other children for his protection because M.L.P. and S.D.P. had "perpetrated" on him.

that they had not been able to get housing before because they were making car payments and paying for car maintenance, but Stacy stated that she could find a place in the next few weeks after the trial, once the next check arrived. Stacy applied to Shelter Plus but missed her appointment with the housing representative. She claimed that she had not been able to get in contact with anyone at Shelter Plus to set up another appointment.

Finally, Stacy testified that the children could possibly live with Michael's sister in Michigan even though she had not informed her attorney about this possibility as of the time of trial. Michael stated that he had not even spoken to his sister. Stacy maintained that she and Michael had informed Wells about the children's aunt, but Michael testified that he had only told Wells the day before trial. There is little testimony in the record about the aunt other than she apparently does not have a criminal history and has two older children.

We acknowledge the hardship that a family faces when displaced from a home because of a natural disaster such as a hurricane, but Stacy and Michael have had ample time to try to find employment, find housing, and improve their overall living conditions. As noted by DFPS, through the course of the case, Stacy and Michael have received services and benefits from CPS, SSI, MHMR, and FEMA, but the family has not been able to utilize those services to provide a stable and consistent life for their children. After

27

reviewing the entire record, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that the termination of Stacy's and Michael's parental rights is in the children's best interest. Accordingly, we overrule Michael's third issue and both of Stacy's issues.

## IV. CONCLUSION

Having overruled all of Michael's and Stacy's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL F:  HOLMAN, J.; CAYCE, C.J. and LIVINGSTON, J.

DELIVERED:  July 31, 2008